STATE v. HAMMERMILL PAPER COMPANY.[1]

July 8, 1921.

No. 22,344.

**Pulpwood consigned to Pennsylvania not taxable in Minnesota.**

Pulpwood was loaded and shipped by rail from the northern forests of Minnesota during the winter season to ports within the state on the shore of Lake Superior where it was stored in the rail carrier's yards

[1]Reported in 184 N. W. 182.

until navigation over the lakes opened in the spring, then shipped to its final destination, which was Erie, Pennsylvania, as shown by the shipping bill. *Held*, that the first movement was a part of an interstate journey, that the delay at the ports did not destroy the interstate feature and that the property did not acquire a situs at the ports for the purpose of taxation.

In the matter of personal property taxes levied against defendant corporation for the year 1918 in the city of Two Harbors and townsite of Knife River, Lake county, the company answered, praying that the taxes and penalties be set aside and defendant be released from all obligation therefor. The matter was heard before Fesler, J., who made the findings and conclusions mentioned in the fourth paragraph of the opinion. From an order denying its motion for a new trial, the state of Minnesota appealed. Affirmed.

*Clifford L. Hilton*, Attorney General, *Egbert S. Oakley*, Assistant Attorney General, and *B. F. Fowler*, County Attorney, for appellant.

*Washburn, Bailey & Mitchell*, for respondent.

QUINN, J.

Defendant is engaged in the manufacture of paper at Erie, Pennsylvania, from pulpwood purchased in different states and shipped by common carrier to its place of business. In October, 1916, it entered into a contract with the Curry & Whyte Company of Duluth, for the purchase of not less than 57,000 nor more than 63,000 cords of pulpwood, one-third thereof to be delivered at the ports of Two Harbors and Knife River on the north shore of Lake Superior, in Minnesota, between the opening of navigation on the lake and November 1 each year for three years. Measurement and acceptance to be made on board cars at vessel loading point between January and April 30. The wood, except about 285 cords which was hauled in on sleds, was cut and loaded on cars in the forests of Northern Minnesota and shipped by rail to the ports mentioned, at interstate freight rates, the billing showing its final destination to be Erie, Pennsylvania.

Upon arriving at Two Harbors or Knife River, at which points it was to be loaded onto boats, the wood was inspected and that which passed inspection was stored in the yards of the railroad over which it had been

shipped and a yardage storage charge made therefor. The wood so accepted remained in the yards until the opening of navigation in the spring, when it was loaded onto boats and transported to its final destination.

On May 1, 1918, there was in store in the yards at the ports named considerable more than 30,000 cords of such pulpwood belonging to respondent, upon which the local authorities assessed and levied a state tax of over $7,000. The validity of that tax is the bone of contention in this lawsuit. The sole question is, was the property in question an article of interstate commerce on May 1, 1918? It is conceded that property in transit from state to state is exempt from state taxation. It has been so held in this state. State v. Maxwell M. S. Co. 142 Minn. 226, 171 N. W. 566.

The trial court found and held that, due to natural causes, it was not possible to transport said pulpwood from Two Harbors or Knife River by boat to Erie, Pennsylvania, until navigation opened in the spring of 1918, and as soon as the navigable season opened on the Great Lakes all of the wood assessed was transported by boat to Erie; that the boats were loaded from the docks of the respective railway companies, and during the whole of the time after the wood was loaded upon cars until the arrival of the same at Erie (except such wood as moved by sleds) was in the care and custody of the rail carriers or the lake carriers; that it was contemplated at the time the wood was loaded on cars for transportation that the same should ultimately be delivered at Erie, and that it was in fact so delivered, but, owing to the fact that it is not possible to operate boats on the Great Lakes by reason of natural causes during the winter season, a considerable part of said wood was in the yards of the respective railway companies at the ports in Minnesota on May 1, 1918, and that the same was in process of transportation by common carrier from the place where it was loaded in Minnesota until it arrived at Erie, and had no taxable situs in this state; that as conclusions of law the personal property tax assessed and levied against the defendant on account of such pulpwood is void and should be set aside, except the amount thereof levied against the defendant by reason of the wood hauled to said ports on sleds, and ordered judgment accordingly. From an order denying appellant's motion for a new trial this appeal was taken.

It is contended on behalf of appellant that the lake ports were used merely as assembling points, and that the purchase and acceptance of the wood on board cars at these points were only for convenience in inspecting and measuring and that storage was a preliminary to the interstate journey. That the assembling of the wood shipped by rail was not different from that brought in on sleds. That the acts necessary to render the commodity shipped an article of interstate commerce remained yet to be performed, namely, the procuring of boats and the loading of the wood for shipment to its destination. And, further, that the indefinite delay at the ports destroyed the interstate feature of the shipment, if any such had attached prior to its arrival at such ports.

The greater portion of the wood in question was cut and loaded on cars back in the woods by the sellers, and then transported by rail to the ports. Interstate rates were applied. These rates were justified by the decision in Pulp & Paper Mnfrs. T. Assn. v. Chicago, M. & St. P. Ry. Co. 34 I. C. C. R. 500, 510, where it is stated, "It appears that during the winter months shipments of pulpwood from points on petitioner's line destined to points on the Great Lakes are hauled to the docks at Knife River, there unloaded, and held until the opening of navigation in the spring. On such shipments petitioner has assessed the intrastate rates, which are higher than those prescribed by us, although it was known to petitioner when these shipments left the points of origin that they were destined to interstate points beyond Knife River. Petitioner seems to be in doubt as to whether or not the interstate rates should have been assessed, but justifies its action by asserting that this traffic was billed only to Knife River. Petitioner appears to fear the presentation of reparation claims because of its having assessed the intrastate rates. We entertain no doubt that such shipments are interstate and subject to the interstate rates."

As to the pulpwood involved in this action, the portion loaded on cars was so billed as to show its ultimate destination to be Erie, Pennsylvania. The trial court so found. The wood was stored with the rail carrier for shipment to Erie as soon as navigation over the lakes would permit. Under its contract $7 per cord was to be paid by the respondent to the seller on or before the fifteenth of each month for all wood measured and accepted during the previous month, the balance of $1.60 per

149 M.—27.

cord to be paid after the arrival of each cargo at Erie. All these matters were proper to be taken into consideration by the trial court in determining whether the wood was held in storage for the purpose of being forwarded to Erie as soon as the season would permit. That court passed upon this question and settled it adversely to appellant. State v. Franklin Sugar-Refining Co. 79 Minn. 127, 81 N. W. 752.

It is common knowledge that the removal of pulpwood from the northern swamps and forests is practically confined to the winter season when the ground is frozen, which necessitates the hauling, unloading and holding at the docks until the opening of navigation in the spring. It is suggested that such shipments might be made by rail, thereby avoiding all delay, but the shipment of pulpwood such a distance by rail would be wholly impracticable. The contract of purchase and sale clearly recognized this fact and contemplated shipment over the lakes. If the contract amounted to an actual sale and the wood was en route to fill the contract, it is of no importance whether the shipment by rail was made out in the name of the shipper or the buyer. The localities seeking to enforce the tax never had any proprietary interest in the wood. The wood was in the course of transportation to another state when the cars left the forest.

Affirmed.